**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT ASHLAND**

UNIVERSITY OF KENTUCKY
and its affiliated corporation
ASHLAND HOSPITAL CORPORATION
d/b/a/ UK KING'S DAUGHTERS PLAINTIFFS

v. **COMPLAINT**

CVS HEALTH CORPORATION,
CAREMARKPCS HEALTH, LLC,
CAREMARK, LLC d/b/a CVS SPECIALTY,
WELLPARTNER, LLC, and JOHN DOES 1-15 DEFENDANTS

* * * * *

The University of Kentucky and its affiliated corporation Ashland Hospital Corporation d/b/a UK King's Daughters,[1] by counsel, file this Complaint against Defendants CVS Health Corporation ("CVS Health"), CaremarkPCS Health, LLC ("CaremarkPCS"), Caremark LLC d/b/a CVS Specialty ("Caremark LLC or "CVS Specialty"), WellPartner, LLC ("WellPartner"), and John Does 1-15 (collectively, "Defendants"), and allege as follows.

## PRELIMINARY STATEMENT

1. Congress enacted the 340B Drug Pricing Program to provide financial support to community hospitals, federally-qualified health centers, and other safety

[1] The University owns and operates six hospitals—UK Chandler, UK Good Samaritan, and Golisano Children's at UK in Lexington; UK King's Daughters in Ashland; UK St. Claire in Morehead; and UK King's Daughters-Portsmouth in Ohio. Although the term "UK HealthCare" is often used to refer to the University's healthcare operations, "UK HealthCare" is not a legal entity, but simply is part and parcel of-and legally synonymous with-the University of Kentucky. Similarly, the terms "UK King's Daughters" and "UK St. Claire" are used to refer to the University's community hospitals. UK King's Daughters and UK St. Claire are owned by affiliated corporations of the University. Under Kentucky law, affiliated corporations are alter egos of the University. *Autry v. W. Kentucky Univ.*, 219 S.W.3d 713, 719 (Ky. 2007); *McGinnis v. Central Kentucky Management Services*, 2019 WL 5190887, at *1–3 (E.D. Ky. Oct. 15, 2019).

net providers that serve a significant number of low-income and uninsured patients. These "Covered Entities"[2] under the 340B Program are entitled to receive discounts on drug costs from drug manufacturers, which enables them to utilize the savings from those discounts to fund their charitable mission of providing quality medical care to the underserved ("340B Savings").

2. Covered Entities realize the 340B Savings through the model of using Pharmacy Benefit Managers ("PBMs") like CaremarkPCS to bill health plans and insurance carriers for 340B-eligible claims. Covered Entities are able to purchase drugs at the "340B discount" from drug manufacturers, in connection with 340B eligible claims. The difference between that discounted acquisition cost and the fair market value reimbursement PBMs pay to Covered Entities for such drugs (the "340B Savings"), provides the "margin" necessary to stretch scarce federal resources and fund indigent care.

3. Defendants CVS Health, CaremarkPCS (the PBM), and their vertically-integrated pharmacies Caremark LLC d/b/a CVS Specialty have conspired to redirect a substantial portion of these 340B Savings to themselves. By surreptitiously diverting funds, Defendants prevent the critical 340B revenue from reaching Covered Entities, in turn negatively impacting their ability to serve indigent and un-insured patients—the intended beneficiaries of the 340B Program.

---

[2] In the 340B Program, a "Covered Entity" is a healthcare provider or organization that meets specific criteria and is therefore eligible to purchase outpatient drugs at discounted prices. These entities include hospitals, Federally Qualified Health Centers, and other safety-net providers. They must register with the HRSA's Office of Pharmacy Affairs ("OPA") and comply with program requirements to purchase medications at the discounted 340B price.

4. The University owns and operates two 340B Covered Entities. The first is associated with UK Chandler, UK Good Samaritan, and Golisano Children's at UK in Lexington in Lexington, Kentucky. The second is associated with UK King's Daughters in Ashland, Kentucky. Due in part to PBM network restrictions that require patients to receive specialty drugs at specific and limited specialty pharmacies, Covered Entities like the University and UK King's Daughters are unable to fill every prescription for a 340B eligible claim at their own in-house pharmacies. For this reason, the University and UK King's Daughters entered into a "Pharmacy Services Agreement" ("Agreement" or "Agreements") with specialty pharmacies also owned by CVS Health, called Caremark LLC d/b/a CVS Specialty, the "Contract Pharmacies."[3] For those 340B eligible patients that are required by network design or elect to have their drugs filled at CVS Specialty, University and UK King's Daughters contractually permitted Caremark LLC/CVS Specialty to retain a "dispensing fee." In order to fulfill the mission of the 340B program, Caremark LLC/CVS Specialty were contractually obligated to remit back to the University and UK King's Daughters all payments received for the drug dispensed to a 340B eligible patient, less the dispensing fee.

5. Covered Entities rely on Contract Pharmacies and third party administrators to manage dispensing the 340B drugs, billing the drug claims to PBMs for adjudication, collecting any applicable co-pay or co-insurance from the

[3] In the 340B Program, a "Contract Pharmacy" is a retail or specialty pharmacy that enters into an agreement with a covered entity (like a hospital or clinic) to dispense medications at discounted 340B prices to the covered entity's patients.

patients, and remitting the fully adjudicated/gross insurance payment amount less a dispensing fee back to the Covered Entities.

6. The Agreements between the University and UK King's Daughters and Caremark LLC require Defendants to pass along to University and UK King's Daughters all revenues the PBM receives from insurance carriers and other third-party payors for the 340B-discounted drugs dispensed, minus a dispensing fee. The adjudicated payment amount from payors, less the dispensing fees, is the amount Defendants owe the University and UK King's Daughters under the Agreements (the "340B Remittance").

7. Caremark LLC d/b/a/ CVS Specialty is well compensated for merely dispensing the 340B drugs that are prescribed by the University's and UK King's Daughters' 340B eligible prescribers, receiving a certain defined percentage of the adjudicated reimbursement for the 340B drugs as their dispensing fee. The dispensing fee is mostly pure profit for Caremark LLC d/b/a CVS Specialty, net of only limited administrative costs, since Contract Pharmacies do not pay the cost of the 340B drugs.

8. But Caremark LLC/CVS Specialty's substantial dispensing fee under the Agreements is not enough for Defendants. To divert and retain even more of the 340B revenue for themselves, CaremarkPCS, Caremark LLC, and other affiliates within the CVS Health umbrella conspired to secretly and drastically lower the 340B Remittance that would be passed on to the University and UK King's Daughters.

9. Defendants improperly diverted 340B Savings for themselves by implementing a secret pricing scheme for 340B drugs, which required cooperation among its affiliated entities within the 340B drug supply chain. Here, CVS Health vertically owns (1) CaremarkPCS, the PBM, that sets network reimbursement rates paid to pharmacies, (2) Caremark LLC d/b/a CVS Specialty, the Contract Pharmacies that dispense the 340B drugs at issue, and (3) WellPartner, the 340B third party administrator ("TPA") that identifies which claims are 340B claims and provides the University and UK King's Daughters with data that hides the actual revenue and payments received by CaremarkPCS for the drugs. These affiliated entities work together behind the prescription drug transaction to secretly manipulate the 340B reimbursement rate while concealing their scheme from the University and UK King's Daughters.

10. The scheme operates as follows. Patients belong to networks. Nearly 68,000 pharmacies participate in each network. A patient can only be in one network. Generally, each network has its own standard network reimbursement rates for all patients in the network. When Caremark LLC/CVS Specialty dispenses a drug to a 340B-eligible patient, it is adjudicated under CaremarkPCS' standard national network reimbursement rate at the point of sale. During the "adjudication process" at the "point of sale," CaremarkPCS informs Caremark LLC/CVS Specialty the reimbursement amount and directs Caremark LLC/CVS Specialty to collect a copayment from the patient. CaremarkPCS pays Caremark LLC/CVS Specialty, the Contract Pharmacy, under this standard reimbursement.

11. After the point of sale, CVS Health's 340B Third Party Administrator, WellPartner flags the adjudicated claim as a 340B claim and relays that information to CaremarkPCS and Caremark LLC/CVS Specialty. For any such 340B claims, CaremarkPCS and Caremark LLC/CVS Specialty reverses the successfully adjudication claim and reprocesses it with an artificially lower reimbursement rate. CaremarkPCS retains the "Spread" comprised of the difference between (1) the total revenue paid from all outside sources or third party payors to CaremarkPCS or its affiliates for 340B drug claims, and (2) the artificially depressed reimbursement amount that CaremarkPCS pays to the Caremark LLC/CVS Specialty dispensing pharmacy (here, a contract pharmacy that has signed a Pharmacy Services Agreements with the University and UK King's Daughters) for the same 340B drugs.

12. After the claim is identified as 340B, CaremarkPCS and Caremark LLC/CVS Specialty agree to an artificially low reimbursement rate for the now-identified 340B drug claim.

13. The 340B reimbursement amount is substantially lower than the original reimbursement amount value that was paid at the point of sale, under the standard network reimbursement rates. Indeed, the patient already received the drug and paid a copayment based on the originally adjudicated claim at the higher standard network reimbursement rate.

14. This 340B arrangement exists solely to divert and retain a significant portion of the 340B Savings intended to flow to the Covered Entities. Upon information and belief, both payors and patients are paying for the drugs at the full

standard reimbursement rate, and they are not refunded the difference, which is instead pocketed by Defendants.

15. The differential pricing scheme resulted and continues to result in Defendants retaining a portion of the 340B Savings on top of the generous dispensing fee and TPA fee permitted under the Agreements. The University and UK King's Daughters are deprived of much of the 340B Savings that they would otherwise have received but for Defendants' unlawful scheme.

16. This not only constitutes a breach of contract by retaining more of the 340B revenue than the Agreements allow but also constitutes fraud and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).

17. The University and UK King's Daughters have conducted an internal investigation using a subset of claims and available remittance data.

18. Based on the University's and UK King's Daughters' preliminary review of this dataset, the University and UK King's Daughters estimate that Defendants' breaches have led to ***more than $41 million dollars*** in damages and losses to the University and UK King's Daughters since 2020.

19. The Agreements have a good faith audit provision, yet Defendants have refused the University's and UK King's Daughters' reasonable requests to access relevant data and conduct a transparent audit of CaremarkPCS, Caremark LLC and their affiliates to determine the full scope of "Spread" on the 340B claims.

20. The above scheme is consistent with publicly available information that

CVS is profiting handsomely from the 340B Program.[4] CVS Health, has warned investors in filings with the SEC that any reduction in 340B contract pharmacy arrangements could "materially and adversely affect the Company,"[5] and both public reporting and congressional investigations alike have revealed that CVS-affiliated retail and specialty contract pharmacies retain a portion of a substantial covered entity's 340B discounts in the hundreds of millions (if not billions) of dollars for CVS.[6]

21. Defendants' fraudulent and deceptive profiteering from 340B is contrary to the intent and purpose of the 340B program, which is to support a Covered Entity's ability to "provide direct clinical care to large numbers of uninsured Americans."

22. Defendants' fraudulent and deceptive practices have harmed the University and UK King's Daughters by taking millions of dollars that were supposed to flow to the University and UK King's Daughters and support the provision of charitable medical care to the uninsured and under-insured.

23. And, when the University and UK King's Daughters sought to conduct an audit of Defendants' books and records as the University and UK King's Daughters were obligated to do under HRSA regulations and permitted to do under the Agreements, Defendants refused to permit an audit. Thereafter, the University and UK King's Daughters invoked the cooperation provision in the parties' Agreements to attempt to resolve the dispute in good faith. Rather than cooperate, Defendants

---

4 *See, e,g.*, https://perma.cc/ZA3R-LKCG (last accessed October 27, 2026).

5 *See* CVS Health Corporation 2021 Form 10-K at 25 (pdf pag.), available at https://perma.cc/KG79-789R (last accessed October 27, 2026).

6 *See, e.g.*, https://perma.cc/L3QV-ME9W (last accessed October 27, 2026); *see also* https://perma.cc/UJH4-T7ZC (last accessed October 27, 2026).

***terminated*** the University and UK King's Daughters from the 340B contract pharmacy arrangement, in retaliation for uncovering the fraudulent scheme described herein and seeking to fulfill their obligations under the 340B Program and HRSA regulations.

24. Defendants' fraudulent, unlawful, and deceptive scheme was knowingly and intentionally carried out to secretly divert 340B Savings to further their own financial growth and profitability.

25. Accordingly, the University and UK King's Daughters bring this action against Defendants seeking redress for the financial harm and lost 340B revenue caused to the University and UK King's Daughters by Defendants' discriminatory pricing, breach of contract, and fraudulent conduct; the University and UK King's Daughters seek three times the 340B revenue and "Spread" that Defendants improperly retained and were unjustly enriched therefrom; the University and UK King's Daughters also seek attorneys' fees and costs; and seek to enjoin the unlawful and retaliatory terminations of the Agreements, and to enjoin Defendants from their ongoing and continuing breaches, as well as any other relief the Court deems just and proper.

## THE PARTIES

### I. The University of Kentucky and UK King's Daughters

26. Plaintiff University of Kentucky is an independent body politic of the Commonwealth of Kentucky with a principal place of business located at 410 Administration Drive, Lexington, Kentucky 40508.

27. Plaintiff Ashland Hospital Corporation operates under the assumed name of UK King's Daughters and is an affiliated corporation of the University. Under Kentucky law, the University's affiliated corporations are alter egos of the University and have the same immunity as the University.[7]

28. The University owns and operates two 340B Covered Entities. The first is associated with UK Chandler, UK Good Samaritan, and Golisano Children's in Lexington, Kentucky. The second is associated with UK King's Daughters in Ashland, Kentucky.

29. The University and UK King's Daughters entered into Pharmacy Services Agreements with Caremark, LLC and/or CVS Pharmacy Inc. for pharmacy services through Caremark, LLC's contract specialty pharmacies.

## II. Defendants

30. Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, RI 02895. At all times relevant to this Complaint, CVS Health exercised common ownership and control over the other Defendants, who are wholly owned subsidiaries of CVS Health. CVS Health transacts and conducts significant business in this judicial district, including through the operation of pharmacy benefit management (PBM) services, its pharmacies and provision of specialty pharmacy services to the University and UK King's Daughters.

31. Defendant CaremarkPCS Health, LLC ("CaremarkPCS") is a Delaware

---

[7] *Autry v. W. Kentucky Univ.*, 219 S.W.3d 713, 719 (Ky. 2007); *McGinnis v. Central Kentucky Management Services*, 2019 WL 5190887, at *1–3 (E.D. Ky. Oct. 15, 2019).

limited liability company with a principal place of business at 9501 E. Shea Blvd., Scottsdale, AZ 85260. CaremarkPCS transacts and conducts significant business in this judicial district, including through the provision of PBM services to the University and UK King's Daughters.

32. Defendant Caremark, LLC ("Caremark LLC") is a California limited liability company with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark LLC transacts and conducts significant business in this judicial district, including through the provision of contract pharmacy services to the University and UK King's Daughters.

33. Caremark LLC is the legal entity that does business as or under the trade name "CVS Specialty Pharmacy" or "CVS Specialty."

34. Defendant WellPartner, LLC ("WellPartner") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. WellPartner transacts and conducts significant business in this judicial district, including through the provision of third-party administration services to the University and UK King's Daughters.

35. Defendants CaremarkPCS, Caremark, LLC, and WellPartner are wholly owned subsidiaries of Defendant CVS Health and, among other things, function as pharmacy benefits managers and pharmacies for prescription drugs administered by CaremarkPCS nationwide. The practices and conduct that is alleged in this Complaint are common and jointly attributable to all Defendants.

36. Defendants John Doe 1-5 are individual officers of CVS Health who

executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive the University and UK King's Daughters and other Covered Entities of 340B revenue they would otherwise have received.

37. Defendants John Doe 6-10 are individual officers of CaremarkPCS who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive the University and UK King's Daughters and other Covered Entities of 340B revenue they would otherwise have received.

38. Defendants John Doe 11-15 are individual officers of Caremark LLC and/or CVS Specialty who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC and CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive the University and UK King's Daughters and other Covered Entities of 340B revenue they would otherwise have received.

39. The identities of the Doe defendants who knowingly executed and ratified the fraudulent scheme described herein are presently unknown to the University and UK King's Daughters. All Doe defendants have served as officers, representatives, and/or agents of the corporate Defendants who employed them and were acting within the course, scope and authority of such employment for the

conduct described below.

## JURISDICTION AND VENUE

40. This Court has federal question jurisdiction over the Racketeer Influenced and Corrupt Organizations Act (RICO) claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964, because this action is brought by the University and UK King's Daughters seeking to enjoin and to recover damages for losses caused by Defendants' violations of RICO.

41. Moreover, exercise of federal jurisdiction over this action is especially appropriate, as the University and UK King's Daughters allege that Defendants are profiteering from the federal 340B Program by diverting funds from the Covered Entities that Congress intended to be the beneficiaries of the 340B Program.

42. This Court has personal jurisdiction over Defendants, because among other things, Defendants are present in the Commonwealth of Kentucky and are authorized to conduct and regularly conduct business in Kentucky. Defendants have marketed, promoted, distributed, and sold its services in Kentucky – including with respect to the Pharmacy Services Agreements with the University and UK King's Daughters – and Defendants have sufficient minimum contacts with this State and sufficiently availed themselves of the protections of the laws of this State through their promotion, sales, marketing, and servicing within Kentucky to render the exercise of jurisdiction by this Court permissible.

43. Defendants further satisfy the requirements for the exercise of personal jurisdiction under the Kentucky long-arm statute, KRS § 454.210.

44. Defendants have committed and conspired to commit tortious activity in the Commonwealth of Kentucky that has caused injury in the Commonwealth.

45. Additionally, the Pharmacy Services Agreements call for Kentucky law to be applied.

46. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a),

47. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated in this district.

## FACTS AND INFORMATION COMMON TO ALL COUNTS

### I. The Federal 340B Program

48. In 1992, Congress enacted Section 340B as an amendment to the Public Health Service Act. Veteran's Health Care Act of 1992, Pub. L. No. 102-585 § 602, 106 Stat. 4943, 4967–71.

49. Congress designed 340B to assist certain healthcare facilities serving poor, uninsured or otherwise vulnerable populations. See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b).

50. Under 340B, drug manufacturers—as a requirement to participate in Medicaid—are required to charge hospitals and other 340B providers no more than a significantly discounted "ceiling price" on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4).

51. In turn, and in theory, 340B providers can "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, 340B providers can seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations (note, most 340B providers are safety net providers, mandated by law or regulation to take on a disproportionate amount of uninsured or indigent patients).

52. Because certain 340B providers may not have in-house pharmacies, the Health Resources and Services Administration (HRSA) – the agency charged with administering 340B – issued sub-regulatory guidance in 1996 permitting 340B providers to "contract" with outside pharmacies (i.e., Contract Pharmacies), and to allow 340B inventory to be dispensed through such Contract Pharmacies. See 61 Fed. Reg. at 43,549.

53. In 2010, however, HRSA dramatically shifted the 340B Contract Pharmacy landscape by permitting 340B providers to maintain an unlimited number of Contract Pharmacy relationships. See 75 Fed. Reg. 10,272-01 (Mar. 5, 2010). In the wake of this HRSA guidance, for-profit pharmacies, especially those owned or affiliated with PBMs, have seized on the opportunity to capitalize on substantial 340B drug discounts. Indeed, the 2010 guidance opened the door for the largest and most sophisticated for-profit PBMs to realize substantial profits by unlawfully misappropriating funds from a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients.

54. The 340B Program "was intended to enable certain hospitals and clinics 'to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" H.R. Rep. 102-384, pt. 2, at 12 (1992). Put another way, a fundamental aim of 340B is to permit 340B providers to "provide direct clinical care to large numbers of uninsured Americans" regardless of their ability to pay. *Id.*

55. HRSA has advised that Covered Entities like the University and UK King's Daughters may use the "savings" obtained by retaining the difference between the "actual acquisition cost" of the 340B-discounted drugs and the usual market reimbursement, "to reach more eligible patients and provide more comprehensive services." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996).

56. Thus, the clear purpose of 340B is that uninsured, poor, and otherwise vulnerable patients would benefit by receiving discounted drugs or charity care.

57. Congress did not intend 340B discounts to become a financial windfall for PBMs and their related pharmacies.

## II. Pharmacy Benefit Managers and the 340B Program

58. PBMs are fiscal intermediaries that administer and manage drug benefits on behalf of health insurance plans. PBMs are primarily responsible for processing and paying prescription drug claims submitted by providers on behalf of covered beneficiaries. The largest PBMs unilaterally dictate the provider's reimbursement for dispensing or administering the drug and the health plan will, in

turn, reimburse the PBM for the amount paid to the provider.

59. The largest PBMs are owned or affiliated with the nation's largest health insurance companies. These PBMs also own or are affiliated with retail, mail-order and/or specialty pharmacies. As a result, a small number of huge, vertically integrated corporations wield near-limitless power and influence in the prescription drug market and the adjudication of 340B eligible claims.

60. Today, three PBMs control nearly 80 percent of the prescription drug market: CaremarkPCS, Express Scripts, and OptumRx.[8] Each of these PBMs also share common ownership with a major insurer and specialty and/or mail-order pharmacy. CaremarkPCS is owned by CVS Health, which also owns health insurer Aetna and CVS retail, mail order, and specialty pharmacies.

61. Between 2010 and 2020, the number of contract pharmacy arrangements with 340B providers grew by 4,228%.[9] This expansion has coincided with an increasing reliance on PBMs. In 2024, hospitals had approximately 83,000 total relationships with contract pharmacies, and just for 2020 and 2025, CaremarkPCS dramatically increased the number of its PBM-affiliated contract pharmacy relationships from approximately 23,000 to 77,000.[10]

---

[8] Adam Fein ("Fein"), Drug Channels ("DC"), *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead,* (Apr. 9, 2024) https://perma.cc/HN8J-W63Q (last accessed October 27, 2026).

[9] Aaron Vandervelde et al ("Vandervelde"), BRG, For-Profit Pharmacy Participation in 340B Program, at 4 (Oct. 2020), https://perma.cc/37XT-GZYJ (last accessed October 27, 2026); *see also* AIR340B ("AIR340B"), *The Impact and Growth in 340B Contract Pharmacy Arrangements – Six Years Later*, at 1, https://perma.cc/SPV4-H9PQ (last accessed October 27, 2026).

[10] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://perma.cc/R9YN-YFD7 (last accessed October 27, 2026).

62. CVS Health is the largest contract pharmacy participant in the 340B Program, with an estimated 77,000 contract pharmacy relationships, out of nearly 230,000 nationally.[11]

63. The above contract pharmacy relationships translate to substantial profits from 340B for the largest PBMs. In 2022 and 2023, CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits.[12]

### III. CaremarkPCS's Operations Within the Broader PBM Landscape

64. The PBM industry has undergone significant consolidation in recent years. As noted above, approximately eighty percent (80%) of the PBM marketplace (or 80% of the covered lives in the United States) is comprised of three PBMs: CaremarkPCS, Express Scripts, and OptumRx. While there are other, smaller PBMs who administer some plans, the vast majority of lives are now managed by these three extremely large PBMs.

65. CaremarkPCS itself controls twenty-seven percent (27%) of the PBM market nationally.[13]

66. As a PBM, CaremarkPCS processes claims for prescription drug benefits for many plan sponsors who are contracted directly with it or with its affiliates. This includes commercial insurance plans, Medicaid plans, and various Medicare Advantage and Medicare Part D plans.

---

[11] *Id.*

[12] *See https://perma.cc/DA8F-32WH* (last accessed October 27, 2026). Upon information and belief, CVS' report of gross profits for its contract pharmacies does not include the profits from the 340B pricing scheme described herein because those profits are captured and reported by CaremarkPCS.

[13] *See* https://perma.cc/5F9X-3GWP (last accessed October 27, 2026); *see also* https://perma.cc/PM5H-3PA4 (last accessed October 27, 2026).

67. PBMs like CaremarkPCS also have a network of pharmacies that dispense drugs to its clients' members and CaremarkPCS unilaterally controls the reimbursement rates and dispensing fees that the network pharmacies receive for the dispensed drugs.

68. In particular, CaremarkPCS manages the pharmacy benefits of more than 80 million plan members and beneficiaries. In addition, because CaremarkPCS is wholly owned by CVS Health, it is affiliated with CVS Health's "mail service pharmacy," an expending specialty pharmacy, CVS Specialty, 9,900 brick and mortar CVS Pharmacies, out of the 77,000 in-network pharmacies in Caremark's "network."

69. PBMs like CaremarkPCS serve as intermediaries between pharmaceutical manufacturers and physician dispensers/pharmacies on one hand, and health benefit plans on the other. By managing both ends of the transaction (i.e., the reimbursement rate PBMs pay to pharmacies and the amounts the PBMs charge health benefit plan for such drugs), PBMs like CaremarkPCS are able to secretly retain Spread and other hidden cash flow to bolster its own profit at the expense of health benefit plans and even Covered Entities.

70. As relevant here, many of CVS Health's retail, mail-order and specialty pharmacies also serve as "Contract Pharmacies" for Covered Entities under the 340B Program. These Contract Pharmacy services are provided under different subsidiary entities, including Defendant Caremark LLC d/b/a CVS Specialty, Inc.

71. CaremarkPCS's and CVS Health's control over all aspects of the marketplace and drug supply chain (e.g., the relationships between drug

manufacturers and health plans, between health plans and network pharmacies, between network pharmacies acting as Contract Pharmacies and Covered Entities, and between CaremarkPCS and 340B TPA WellPartner), allows Defendants to engage in fraudulent schemes, including the 340B discriminatory pricing scheme alleged herein.

## IV. Relationship Between Defendants, Group Health Plans and Insurance Carriers, and Pharmacies

72. Group health plans, including self-funded employer plans, contract with CaremarkPCS for provision of administrative services related to adjudication and payment of network claims.

73. CaremarkPCS' pharmacy network includes mail-order, specialty, and retail pharmacies owned and operated by subsidiaries under the CVS Health umbrella, including pharmacies operated by Defendant Caremark LLC d/b/a CVS Specialty.

74. CaremarkPCS requires network pharmacies to comply with its policies, procedures, and other terms and conditions for network participation, including the reimbursement rates (including the ingredient cost and dispensing fees) that the pharmacies will receive from CaremarkPCS for the drugs dispensed to members of CaremarkPCS' clients.

75. Once CaremarkPCS receives a claim from a network pharmacy at the "point of sale" and the PBM determines that billed services are covered by one of its clients' plans, it determines at the point of sale, through an online adjudication process, the eligibility of the claim under a particular network, the reimbursement

amount the network pharmacy is entitled to as per the rates dictated by CaremarkPCS (the "point-of-sale reimbursement rate"), and the appropriate co-pay or co-insurance amount that must be paid by the patient.

## V. The Role of 340B Third Party Administrator WellPartner

76. The process of determining whether a particular claim is 340B eligible is complex, and responsibility for compliance lies with the Covered Entity. Among other duties, Covered Entities must ensure that prescriptions are 340B eligible, PBM payments to the Contract Pharmacies are tracked, and that the covered entity's 340B inventories are properly replenished.

77. To meet these responsibilities, Covered Entities typically hire a 340B Third Party Administrator ("340B TPA") that provides claims processing and management services and retroactively confirm which claims are 340B-eligible. TPAs, in turn, also receive a fee for their administrative services pursuant to contracts with the Covered Entities.

78. In fact, Contract Pharmacies owned or affiliated with CVS Health **mandate** the use of CVS's wholly owned subsidiary, WellPartner, as the 340B TPA by the Covered Entities.[14] The contract between the University and UK King's Daughters and WellPartner for TPA services is a mandatory addendum to the Pharmacy Services Agreements. This mandate is set so that Defendants can secretly

---

[14] Defendants have been sued across the country by Covered Entities for mandating the use of WellPartner as an unlawful tying arrangement. *See, e.g.*, *Brandywine Hospital, LLC v. CVS Health Corporation, et al.*, E.D. Pa. No. 2:23-cv-1458; *Sentry Data Systems Inc. v. CVS Health, et al.*, S.D. Fla. No. 0:18-cv-60257.

hide their fraudulent activity behind inaccurate and misleading data so that they divert the 340B Savings.

79. Contract Pharmacies do not determine prior to or at the point of sale whether the patient is eligible for 340B-discounted drugs. Instead, 340B determination occurs on the back-end, after the drugs have already been dispensed by the pharmacy, or in this case the Contract Pharmacy, to the 340B eligible patient.

80. When dispensing the 340B drugs, the Contract Pharmacy will also collect the applicable co-pay/co-insurance from the patient at the point of sale, even on 340B-discounted drugs. In the point of sale adjudication process, the PBM reports to the Contract Pharmacy the co- insurance the pharmacy must collect from the patient.

81. The co-pay or co-insurance amount collected from the patient is based on the originally adjudicated point-of-sale reimbursement rate that the PBM determines should be paid to the pharmacy for the cost of the drugs. This is again because, at the point of sale, the Contract Pharmacy is unaware that the drugs being dispensed are 340B-discounted drugs.

82. The complex relationship between the CaremarkPCS (the PBM), Caremark LLC/CVS Specialty (the Contract Pharmacies), WellPartner (the 340B TPA), and the University and UK King's Daughters (the Covered Entity) is summarized in the figure below, relating to a Medicare claim:




83. From left to right in the figure, an insurance plan (Plan) pays CaremarkPCS (the PBM) for the drug dispensed to a patient. CaremarkPCS then pays CVS Specialty (the Contract Pharmacy) for dispensing the drug. CVS Specialty keeps a dispensing fee and remits the remainder to the Covered Entity (the "340B Remittance"). Finally, WellPartner (the TPA) takes an administrative fee. The University and UK King's Daughters (the Covered Entities) receive the remaining money (the "340B Savings").

84. CaremarkPCS and CVS Health exploit their vertical control over the entirety of the 340B Drug Supply Chain, through the PBM, the mandatory use of WellPartner and CVS Specialty.

85. Through that process, Defendants have created a discriminatory pricing scheme wherein CaremarkPCS receives payment for a drug claim from the payor/plan; adjudicates the drug claim at the point of sale at the standard national network reimbursement rates, and determines the appropriate pharmacy reimbursement and co-pay/co-insurance amounts; CVS Specialty actually collects the adjudicated reimbursement and co-pay/co-insurance.

86. However, after WellPartner informs CaremarkPCS and CVS Specialty that the claim is a 340B drug claim, CaremarkPCS and CVS Specialty reprocess the already successfully-adjudicated claim in a secret 340B-only network. In this 340B-only network, Caremark PCS artificially reduces the reimbursement on that claim, despite the fact that the patient has already paid the relevant co-pay or co-insurance on the higher price, and retains the difference between the original point-of-sale reimbursement and the artificially reduced rate. Defendants do not inform Covered Entities of the original, higher reimbursement for the drug.

87. Defendants have no legitimate purpose for this transaction other than to divert a higher than contractually required portion of the 340B Savings to themselves as pure profit.

88. As a consequence of Defendants' actions, the intended 340B savings is not passed on to the University and UK King's Daughters/Covered Entities to be used for 340B program intended purposes such as indigent care programs.

## VI. The Parties' Pharmacy Service Agreements

89. The Agreements between the University and UK King's Daughters and Caremark LLC provide for the provision of Contract Pharmacy services by Caremark LLC (as the "Specialty Pharmacy").

90. The Agreements impose obligations not merely on Caremark but also their "subsidiaries/affiliates." Indeed, in the introductory paragraph to the Agreements, the parties are defined as the "Covered Entity," on the one hand, and Caremark LLC "on behalf of itself and its subsidiaries/affiliates" (collectively defined as the "Pharmacy") on the other hand.

91. As relevant here, the Agreements contain substantially similar provisions that provide that the "Pharmacy" (again, defined as Caremark LLC and its affiliates) owes the University and UK King's Daughters an amount equal to the reimbursement for the drug less the Dispensing Fee.

92. In other words, under the Agreements, ***all reimbursement*** received by Caremark LLC or any of its affiliates from third party payors must be remitted to the University and UK King's Daughters/Covered Entities less the applicable dispensing fee. And, because Defendants CVS Health and CaremarkPCS, among others, are also affiliates of Caremark, any payments the PBM receives from payors must also be passed on to the University and UK King's Daughters/Covered Entities.

93. As further alleged below, Defendants failed to comply with this pass-through provision of the Agreements.

## VII. The Audit Provisions in the Pharmacy Service Agreements

94. In part because of the opaqueness of how 340B claims are identified after the point of sale, HRSA requires Covered Entities to audit their Contract Pharmacies to ensure that 340B drugs are not being diverted (i.e., going to non-eligible patients) and that Covered Entities' participation in the 340B program comply with all 340B rules and regulations.[15]

95. The Pharmacy Services Agreements contain procedures for the University and UK King's Daughters to conduct audits of Caremark LLC.

96. Under the audit provision, the University and UK King's Daughters have the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

97. Caremark LLC, in its capacity as the Contract Pharmacy, agreed to cooperate with any such audits in good faith.

98. As further alleged below, Caremark LLC failed to meet its obligation to comply with the University's and UK King's Daughters' reasonable audit requests.

99. CaremarkPCS and Caremark LLC's motivation to refuse to permit the audit was to hide the fact that Defendants diverted the 340B Savings to themselves in violation of Program terms and Agreements terms.

---

[15] HRSA audit and compliance parameters under the contract pharmacy guidelines (last accessed October 27, 2026) at https://perma.cc/TLV5-6FHJ .

## VIII. HRSA Guidelines and Regulations Governing Contract Pharmacy Services Agreements

100. The Agreements also state that Caremark LLC shall comply with the contract pharmacy services guidelines as promulgated by HRSA's Office of Pharmacy Affairs ("OPA").

101. HRSA has stated that the "340B Program enables covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[16]

102. HRSA has also issued guidance that Covered Entities may bill insurers for the 340B drugs at higher than the actual acquisition cost, and use the revenue from the usual market reimbursement to "reach more eligible patients and provide more comprehensive services" 61 Fed. Reg. 43549, 43551 (Aug. 23, 1996 Final Notice).

103. In 2010, HRSA reaffirmed that "***the benefit of the program was intended to accrue to the covered entities***" – not to the PBMs. 75 Fed. Reg. 10272, 10277 (Mar. 5, 2010 Final Notice) (emphasis added). Additionally, in the same guidance, HRSA explained that the Covered Entity is "free to negotiate how it chooses to use any [340B] funds as it sees fit." *Id.*

104. As further alleged below, Caremark LLC failed to meet its obligation to comply with these HRSA/OPA guidelines and regulations.

[16] *See* https://perma.cc/M8AK-CKTQ (last accessed October 27, 2026).

## IX. Defendants' Fraudulent and Discriminatory Pricing Scheme on 340B Claims and Retention of the Spread Between the Amount Paid by the Payor/Plan and the Monies Received by the Covered Entity

105. Through their discriminatory pricing scheme, Caremark LLC d/b/a CVS Specialty, in conjunction and coordination with CVS Health, CaremarkPCS, and WellPartner, conspired together to breach the above-referenced HRSA regulations and guidelines, and to hide those breaches. The individual Doe defendants are unidentified employees and officers of CVS Health Corporation, CaremarkPCS Health, and Caremark LLC who knowingly ratified and executed the illegal and fraudulent scheme described herein and set the scheme in motion.

106. Caremark LLC d/b/a CVS Specialty serves as Contract Pharmacies for the University and UK King's Daughters (Covered Entities) pursuant to the Agreements. The Contract Pharmacy services are provided by specialty pharmacies that are already part of CaremarkPCS' standard pharmacy networks. Each standard pharmacy network has "covered lives" in it, and pre-determined standard reimbursement rates.

107. When a 340B eligible patient of the University or UK King's Daughters seeks to fill a prescription for 340B drugs at Caremark LLC or CVS Specialty, the claim is (1) adjudicated by CaremarkPCS/the PBM at the point of sale based on the standard network reimbursement rates; (2) the drugs are dispensed to the patient; (3) CaremarkPCS/the PBM reimburses CVS Specialty/the Contract Pharmacy according to the reimbursement rate under the applicable standard national network

reimbursement rates; and (4) the patient pays the applicable co-pay or co-insurance based on the standard national network reimbursement.

108. Subsequently, CVS' wholly-owned 340B TPA WellPartner determines that the patient is 340B eligible and that the specialty drugs that were dispensed were in fact the 340B eligible drugs connected to the University and UK King's Daughters/Covered Entities.

109. Once the 340B determination is made, Caremark LLC/CVS Pharmacy is obligated to pass on all insurance payments for the 340B drugs to the University and UK King's Daughters, less an agreed-upon dispensing fee.

110. But this is not what occurs. For patients that receive specialty drugs from CVS Specialty where the PBM is CaremarkPCS, the University and UK King's Daughters received a drastically reduced reimbursement rate for the 340B drugs.

111. The reason is Defendants' discriminatory pricing scheme for 340B drugs. CaremarkPCS and CVS Specialty conspire to artificially reduce the reimbursement rate to divert 340B Savings from the Covered Entities. CaremarkPCS retains the difference between the original point of sale payment for the drug and the lower reimbursement amount.

112. The University and UK King's Daughters have access to reports from WellPartner, the 340B TPA, that show the "Insurance Paid Amount" reflecting the payor reimbursement reported by CVS Specialty and remitted to the University and UK King's Daughters. This "Insurance Paid Amount" in the WellPartner reports is

substantially lower than the amount that CaremarkPCS actually received for the 340B drugs.

113. The WellPartner reports also contain a column/field for the applicable co-pay/co-insurance collected from patients on each 340B drug claim, but this column/field falsely reflects a "patient paid" amount of $0 for the majority of claims.

114. WellPartner therefore aids in making sure the fraud is hidden by falsely reporting the revenue received by CaremarkPCS.

115. Between 2020 and October 2025,[17] the University and UK King's Daughters estimate that the "delta" between deflated reimbursement rate paid to CVS/Caremark Contract Pharmacy and remitted to the Covered Entity, and the usual market reimbursement rate, exceeds ***$41 million***, as shown below:

| Year | Estimated Loss |
|---|---|
| 2020 | $3,235,482.88 |
| 2021 | $5,173,967.82 |
| 2022 | $6,964,038.79 |
| 2023 | $9,410,463.03 |
| 2024 | $10,710,595.90 |
| 2025 | $5,591,804.74 |

Total: **$41,086,353**

116. The explanation is CaremarkPCS, Caremark LLC and CVS Specialty's discriminatory pricing scheme wherein Defendants and their affiliates arbitrarily slash the reimbursement on the 340B claims so that they can manufacture "Spread."

117. Because the claim was already adjudicated at the point of sale by CaremarkPCS, the only way the "switch" occurs is if CaremarkPCS and Caremark

[17] Kentucky provides for a ten-year statute of limitations period for breach of contract claims. KRS § 413.160. In light that, the University's and UK King's Daughters' damages are likely substantially greater than the damages estimate set forth below.

LLC/CVS Specialty are covertly working together to deprive the 340B Covered Entities of funding intended for charitable and indigent care. Defendants do this solely to reduce the 340B Remittance that is owed to the Plaintiff's Covered Entities under the Agreements and divert more of the 340B revenue to themselves.

118. The switch to the lower-reimbursement occurs entirely on the back-end by and between CaremarkPCS (the PBM) and Caremark LLC/CVS Specialty (the Specialty Pharmacy), out of sight of the payors, Covered Entities, or even the patients, who end up paying more out-of-pocket based on the higher, originally adjudicated price.

119. To summarize, under CVS's discriminatory 340B pricing scheme, CaremarkPCS receives the originally adjudicated reimbursement amount (reflecting the standard network reimbursement rate CaremarkPCS paid at the point of sale before the pharmacy knows whether the drugs being dispensed are 340B-discounted drugs). After learning that the claim was a 340B claim, CaremarkPCS and Caremark LLC/CVS Specialty conspire to lower the point-of-sale Reimbursement amount by reversing and re-adjudicating the claim. CaremarkPCS re-adjudicates the claim with a lower reimbursement rate for the purpose of creating an artificial "Spread" and keeps the difference.

120. To illustrate how the scheme works, suppose a hypothetical drug with an Average Wholesale Price ("AWP") of $10,000 is typically reimbursed by CaremarkPCS to CVS Specialty at AWP-10%. The PBM thus should have paid CVS Specialty $9,000, and under the Agreements, the University and UK King's

Daughters should have received $9,000 minus a dispensing fee and a TPA fee charged by WellPartner.

121. Under Defendants' Scheme, however, once the claim is identified as 340B, the $9,000 transaction is reversed and altered to reflect the substantially reduced reimbursement rate. The "standard network rate" of approximately AWP-10% is changed to AWP-35%, as a hypothetical example, yielding a reimbursement rate of $6,500 (instead of $9,000). CaremarkPCS pays CVS Specialty the $6,500 for the 340B drug, and CaremarkPCS retains the additional $2,500 simply because CaremarkPCS knows it is a 340B claim where there is a large delta between the cost of the drug and the reimbursement.



122. To further illustrate how the scheme works, take the following real-world examples of 340B claims processed by CaremarkPCS:

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | University of Kentucky Specialty Pharmacy Reimbursement | Delta |
|---|---|---|---|---|
| Stelara (57894006103) | 10/15/24 | $19,378.62 | $27,397.41 | $8,018.79 |
| Humira (00074433902) | 7/24/24 | $4,818.14 | $6,811.88 | $1,993.74 |

123. Both sets of claims in the table above are for the exact same 340B drugs (including quantity dispensed), dispensed on the same date, and covered by the same insurance plan (managed by CaremarkPCS).[18]

124. In the first example, when the Stelara prescription was filled at a University of Kentucky Specialty pharmacy, the Covered Entity received from the pharmacy a payor reimbursement amount of $27,397.41, representing the gross insurance payment amount for the drugs.

125. However, when an identical Stelara prescription was filled by CVS Specialty, the Covered Entity received a payor reimbursement amount of just $19,378.62.

126. The $8,018.79 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

127. In the second example, when the Humira prescription was filled at a University of Kentucky Specialty pharmacy, the Covered Entity received from the pharmacy a payor reimbursement amount of $6,811.88, representing the gross

[18] For purposes of maintaining confidentiality, the identity of the patient, the drug dispensed, and payor information are not specified herein.

insurance payment amount for the drugs.

128. However, when an identical Humira prescription was filled by CVS Specialty, the Covered Entity received a payor reimbursement amount of just $4,818.14.

129. The $1,993.74 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

130. The significant gaps between the remitted payor reimbursement amounts ($8,018.79 and $1,993.74 respectively) do not take into account the dispensing fee paid to Caremark LLC/CVS Specialty under the Agreements or the TPA fee paid to WellPartner. Instead, the payor reimbursement reflects the reimbursement reported as received by the CVS Specialty/Contract Pharmacy from insurance plans/payors.

131. This gap cannot be explained by variances in reimbursement rates paid by different payors or plans, since both claims were paid by the same insurance plan.

132. Moreover, the University and UK King's Daughters know that the higher payor reimbursement amounts ($27,397.41 and $6,811.88 respectively) remitted to the Covered Entity on the claim dispensed at a University of Kentucky Specialty Pharmacy are representative of the fair market reimbursement rate for the drugs.

133. In fact, claims data obtained from the University of Kentucky Plan reveals that, back in 2024, the Plan paid $25,058.56 on a non-340B claim for Stelara dispensed at a University of Kentucky Specialty Pharmacy. Although payment on

this claim was administered by a different PBM (not CaremarkPCS), this payment is consistent with the fair market reimbursement for the dispensed drugs. Both the $25,058.56 paid by the Plan and the $27,397.41 in payor reimbursement paid by CaremarkPCS to a University of Kentucky Specialty pharmacy in the above example are far closer to fair market reimbursement for Stelara than the artificially depressed $19,378.62 paid by CaremarkPCS to CaremarkLLC/CVS Specialty.

134. Thus, the $19,378.62 in payor reimbursement reported by CVS Specialty and remitted to the University and UK King's Daughters is far below the fair market reimbursement rate for Stelara in the example 340B claim. This reflects the reduced reimbursement rate under a secret 340B discriminatory pricing scheme between CaremarkPCS and Caremark LLC/CVS Specialty.

135. Indeed, an independent pharmacy and data analytics expert has reviewed the data and reimbursement rates reportedly received by CVS Specialty in the WellPartner remittance reports and concluded that they are far below CaremarkPCS's national network reimbursement rates.

136. Defendants' artificially deflated reimbursement scheme for 340B specialty drug claims is further demonstrated through the average monthly unit cost data that Aetna and Silverscript Medicare Part D Plans (both administered by CaremarkPCS) reported to CMS. Each year, Part D Plan Sponsors are required to submit drug unit cost data to CMS, which is then published by CMS in the CMS Prescription Drug Plan Public Use File ("PPUF") dataset.[19]

[19] Available at https://perma.cc/L75F-82ZK (last accessed October 27, 2026).

137. For example, Silverscript reported for the drug Austedo (NDC 68546017260) an "average monthly unit cost" of $123.07 for Quarter 3 2022. In comparison, on July 25, 2022, CVS Specialty, through WellPartner, reported that it received $15,911.76 for 150 units of Austedo, or $106.07 per unit, in reimbursement from a Silverscript Part D Plan.

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | CVS Specialty Pharmacy Reimburseme nt Per Unit | Silverscript PDP Reported Average Unit Cost in Q3 2022 |
|---|---|---|---|---|
| Austedo (68546017260) | 7/25/2022 | $15,911.76 | $106.07 | $123.07 |

138. Defendants lowered the 340B reimbursement by approximately $17 per pill for this particular drug simply to create a spread so that Defendants can pocket 340B Savings intended for the University and UK King's Daughters to use for uninsured and indigent care programs.

139. The various examples and comparators set forth herein conclusively demonstrate that CaremarkPCS is paying CVS Specialty a reduced reimbursement for 340B-eligible specialty drugs that is drastically lower than the point-of-sale reimbursement paid to CaremarkPCS under its standard national pharmacy network.

140. But this reduced reimbursement rate is not disclosed to anyone outside of CVS Health umbrella. In particular, the lower rate was not passed onto the plans and payors who foot the bill for the drug claim. Instead, the plans and payors paid

the higher point-of-sale adjudication price for the 340B drugs that reflects the usual market reimbursement rate.[20]

141. The patients are also paying a copay and co-insurance for the drugs based on the originally adjudicated amount.

142. The payors and patients who foot the bill for the drugs see no benefit of the lower "secret 340B" price; instead, the Defendants conceal the true price so they can retain all the "Spread" for themselves.

143. And, despite the payors and patients paying the originally adjudicated market reimbursement rate, this amount does not flow to the University and UK King's Daughters/Covered Entities. Instead, Defendants divert a percentage of the 340B revenues to itself.

144. Notably, ***no other parties outside of the CVS umbrella*** – not the payors, not the Covered Entities, and not the patients – knew about, consented to, or benefited from, the reduced secret 340B rate.

145. Indeed, even the Contract Pharmacies (Caremark LLC and CVS Specialty) would not have agreed to the lower 340B rate because it also reduces the dispensing fee that the Contract Pharmacies would be entitled to receive. This demonstrates that there is no true arms' length relationship between CaremarkPCS and Caremark LLC/CVS Specialty.

146. But the small difference in lost dispensing fee pales in comparison to the large Spread that CVS Health/CaremarkPCS receives, retains and profits from the

---

[20] Several States have 340B discriminatory pricing laws that prohibit lower payments for 340B drug claims.

340B scheme. In other words, the scheme results in a huge net positive for the Defendants.

147. In fact, through the scheme, **CVS retains more than half of the 340B Savings** (defined as total third-party payor revenue on 340B drugs minus the 340B drug cost).

148. Between 2020 and 2025, the University and UK King's Daughters estimate that **CVS/Caremark pocketed approximately 55.8% in 340B savings** (comprised of the dispensing fee, TPA fee, and 340B spread retained through CVS's artificially deflated reimbursement scheme), **whereas the Covered Entities only received 44.2%**:




149. It is contrary to the fundamental design of the 340B Program that CVS/Caremark receive more than half of the 340B Savings because the 340B Savings

is intended to flow to the Covered Entities to fund uninsured and indigent clinical care.

150. Moreover, the patients are also victimized by Defendants' scheme, since they pay a co-pay or co-insurance based on the higher, non-340B reimbursement rate initially adjudicated by the PBM at the point of sale. Upon information and belief, any excess co-pay or co-insurance paid by the patient as a result of the switch to the secret 340B price is not refunded.

151. WellPartner, CaremarkPCS, and CVS Pharmacy must conceal the full co-pay and co-insurance amounts from the Covered Entity, or otherwise it would reveal that the patients are paying co-pay and co-insurance at the point of sale based on a higher reimbursement rate.

152. The Defendants' scheme is a breach of the Agreements and violates HRSA and OPA regulations and guidelines regarding contract pharmacy services.

153. Defendants agreed that the University and UK King's Daughters would receive the full payment amount from all payors based on the usual market reimbursement for the 340B drugs, less the agreed-upon dispensing fee and TPA fee. However, due to Defendants' secret 340B arrangement, the University and UK King's Daughters received far lower than the usual market reimbursement rate because Defendants contrived a scheme where CaremarkPCS retains a portion of the drug reimbursement and then pays Caremark LLC/CVS Specialty lower rates for the 340B claims, despite the fact that CaremarkPCS charged the plan/payor the original higher

amount, and the 340B eligible patient the original higher copay just so that Defendants retain 340B profits.

154. Defendants falsely represented to the University and UK King's Daughters that the 340B Remittance received by the Covered Entities was equal to the total reimbursement that the contract pharmacies (Caremark LLC and/or CVS Specialty) and their affiliates received for the 340B drugs (less the agreed-upon fees) but had actual knowledge that this was not the case.

155. Defendants knowingly and willingly engaged in this fraudulent and deceptive scheme regarding 340B drug claims despite the fact that it violates HRSA and OPA regulations and guidelines.

156. Defendants' scheme also constitutes wire fraud, and each Defendant played a distinct role in the execution of the scheme: (a) CaremarkPCS (in Arizona) transmitted electronic claims adjudication data and post-sale rate-reduction instructions via interstate computer networks directing CVS Specialty Caremark LLC to accept, and CaremarkPCS to retain, an artificially depressed "340B rate" for each identified 340B claim; (b) Caremark LLC/CVS Specialty (both in Rhode Island) knowingly accepted the artificially reduced 340B rates directed by CaremarkPCS, transmitted and caused to be transmitted electronic reimbursement data reflecting those false amounts, and provided those false amounts to WellPartner for transmission to the University and UK King's Daughters, despite being contractually obligated under the Agreements to pass the full reimbursement; (c) WellPartner, LLC (in Rhode Island) generated and transmitted to the University and UK King's

Daughters—by means of interstate electronic wire communications—remittance reports that falsely stated the reimbursements received and falsely reported patient co-pay/co-insurance amounts of $0.00; and (d) CVS Health Corporation, as the parent and controlling entity, directed and ratified the above conduct with full knowledge that the electronic remittance data transmitted to the University and UK King's Daughters was materially false and that the University and UK King's Daughters were deprived of 340B revenues to which they were entitled

## X. The October 31, 2025 Audit Demand and Retaliatory Termination of the Agreements

157. On October 31, 2025, the University and UK King's Daughters, through counsel, sent a demand letter to the Executive Director of 340B at CVS Health and CVS Pharmacy Inc. (the "Demand Letter") requesting access to relevant data to conduct an audit.

158. In that Demand Letter, the University and UK King's Daughters demanded that Caremark LLC and CaremarkPCS provide access to their books and records, including all electronic records, to verify and ensure compliance with the duties, obligations, and transactions outlined in the Agreements.

159. The University and UK King's Daughters requested, among other things, (1) data showing any adjudication of the Covered Entity's claims prior to the time the Pharmacy knew the patient was 340B eligible; (2) all communications between Caremark LLC/CVS Specialty and WellPartner, (3) reconciliation reports for 340B drugs; (4) bi-monthly invoices identifying all claims that the Pharmacy will provide reimbursement to the University and UK King's Daughters; and (5) the

reimbursement addenda in the contracts between Caremark LLC/CVS Specialty and various PBMs and plan sponsors.

160. As of the date of filing, however, Defendants have not meaningfully responded to the University's and UK King's Daughters' requests for data and information.

161. Instead, on April 22, 2026, in an effort to preclude the Covered Entities from exercising their right to conduct an audit as they are obligated to do under HRSA regulations, Defendants gave notice of termination of the Agreements.

* * *

162. By retaining Spread and taking money intended to flow to the University and UK King's Daughters for use in indigent care in accordance with the 340B Program and refusing to provide the necessary data to evaluate the extent of Defendants' behavior and losses to the University and UK King's Daughters, Defendants have breached the Agreements and Kentucky common law.

163. Furthermore, by conspiring to unlawfully deprive the University and UK King's Daughters of their 340B savings, Defendants conducted an enterprise to carry out its scheme to commit a pattern of unlawful racketeering activity in violation of RICO, thereby causing significant financial injury to the University and UK King's Daughters.

## CAUSES OF ACTION

## COUNT ONE
## BREACH OF CONTRACT

164. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

165. The University and UK King's Daughters entered into Pharmacy Services Agreements with Caremark LLC d/b/a CVS Specialty. The Agreements constitute valid contracts between the University and UK King's Daughters and Caremark LLC d/b/a CVS Specialty, which governs the relationship between the Parties.

166. The Agreements contain a provision relating to the remittance of all reimbursement obtained by Defendants from all sources (including patients and third-party payors), less an agreed-upon dispensing fee, to the University and UK King's Daughters.

167. This provision applies not just to Caremark LLC, but also to its subsidiaries and affiliates, including Defendants CVS Health, WellPartner, and CaremarkPCS.

168. The Agreements contain a provision under which the Contract Pharmacies agreed to abide by and comply with HRSA and OPA regulations and guidelines governing contract pharmacy services.

169. The Agreements also contain an audit provision under which the University and UK King's Daughters have the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

170. The Agreements further contain a compliance with law provision where Defendants agreed to comply with laws.

171. The University and UK King's Daughters adequately performed all their obligations under the Agreements.

172. However, Defendants failed to perform under the Agreements, by (1) not remitting all payments made to CaremarkPCS at the point-of-sale for the 340B drugs to the University and UK King's Daughters; (2) lowering the 340B reimbursement amount paid to Caremark LLC/CVS Specialty for no purpose other than to deprive the University and UK King's Daughters of the 340B Savings; (3) not complying with HRSA and OPA regulations and guidelines referenced above that require Caremark LLC/CVS Specialty to ensure that all 340B savings will accrue to the Covered Entity and that Defendants will not retain Spread on 340B claims; and (4) not complying with the University's and UK King's Daughters' reasonable audit requests.

173. The University and UK King's Daughters estimate *more than $41 million in losses of 340B revenue* due to Defendants' 340B scam over the last six years.

174. As a direct and proximate result of Defendants' breach of contract, the University and UK King's Daughters (and their patients and beneficiaries) have suffered a concrete and irreparable harm as well as significant damages in an amount to be determined at trial.

**COUNT TWO**
**COMMON LAW FRAUD / INTENTIONAL MISREPRESENTATION AND FRAUDULENT CONCEALMENT**

175. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein. This Count is pleaded independently of the University's and UK King's Daughters' contract claims and is predicated on Defendants' violation of a duty to refrain from deceit that Kentucky law imposes independently of any contract.

176. The false statements at issue are the monthly electronic remittance reports that WellPartner, LLC generated and transmitted to the University and UK King's Daughters, and the reimbursement data that Caremark LLC d/b/a CVS Specialty furnished to WellPartner for inclusion in those reports.

177. WellPartner, LLC, the CVS-owned 340B third-party administrator that Defendants required the University and UK King's Daughters to use, generated and transmitted each remittance report. Caremark LLC d/b/a CVS Specialty supplied the underlying reimbursement figures reported therein. CaremarkPCS Health, LLC generated and transmitted the post-adjudication rate-reduction instructions that made those figures false. CVS Health Corporation, as the common parent that owns and controls each of the foregoing entities, directed and ratified the reporting practice. The individual officers and employees who authorized and implemented the practice are named as John Does 1-15; their identities are presently unknown to the University and UK King's Daughters because they are within Defendants' exclusive knowledge and Defendants have refused the University's and UK King's Daughters'

audit demand seeking that information.

178. Each remittance report affirmatively represented, in a field denominated "Insurance Paid Amount" or "Program Revenue," that the stated dollar figure was the full amount received from the applicable third-party payor for the identified 340B drug claim, and, in a separate field, that the patient co-pay or co-insurance collected on that claim was $0.00. Both representations were false. The stated reimbursement figure was in fact an artificially depressed post-adjudication "340B rate" that Defendants substituted for the amount actually adjudicated and paid at the point of sale, and patients had in fact paid co-pays and co-insurance calculated on the higher point-of-sale amount.

179. Defendants made these representations on a recurring monthly basis in every remittance cycle from at least January 2020 through the termination of the Agreements in 2026, and on a per-claim basis with respect to each of the thousands of 340B claims reported in each cycle.

180. Each report was transmitted by interstate electronic data transmission from WellPartner's systems in Rhode Island to the University's and UK King's Daughters' systems at their principal place of business in Kentucky, and was received there by the personnel in the University's and UK King's Daughters' pharmacy finance and 340B compliance functions.

181. As an example of why the statements were false, for a Stelara prescription (NDC 57894006103) dispensed by CVS Specialty on October 15, 2024, the remittance report transmitted to Plaintiff stated a payor reimbursement of

$19,378.62. That figure was false. For an identical Stelara prescription, in the same quantity, dispensed on the same date, and covered by the same CaremarkPCS-administered plan, Plaintiff received $27,397.41 when the prescription was filled at a University of Kentucky Specialty Pharmacy. The $8,018.79 difference is the Spread that Defendants retained and concealed.

182. As another example, for a Humira prescription (NDC 00074433902) dispensed by CVS Specialty on July 24, 2024, the remittance report stated a payor reimbursement of $4,818.14. For an identical Humira prescription dispensed in the same month under the same plan and filled at a University of Kentucky Specialty Pharmacy, Plaintiff received $6,811.88 — a concealed difference of $1,993.74.

183. As an additional example, on July 25, 2022, CVS Specialty, through WellPartner, reported receiving $15,911.76 for 150 units of Austedo (NDC 68546017260), or $106.07 per unit, from a SilverScript Part D plan. SilverScript, itself administered by CaremarkPCS, separately reported to CMS an average monthly unit cost of $123.07 for that same drug in the same quarter — approximately $17 per unit more than the amount CaremarkPCS reported paying its own affiliated pharmacy.

184. Each Defendant's distinct role in the fraud is as follows: (i) CaremarkPCS Health, LLC, operating from Scottsdale, Arizona, adjudicated each claim at the standard national network rate; after WellPartner flagged the claim as 340B-eligible, CaremarkPCS Health, LLC transmitted an electronic instruction reducing the reimbursement to a secret 340B rate, and retained the resulting Spread;

(ii) Caremark LLC d/b/a CVS Specialty, operating from Woonsocket, Rhode Island, entered into a secret agreement with CaremarkPCS Health, LLC to reprocess the 340B claims after they were flagged as 340B by WellPartner, and accepted the reduced rate notwithstanding that it thereby reduced its own dispensing fee, and reported the reduced figure, rather than the point-of-sale figure it had originally been paid, to WellPartner for transmission to the University and UK King's Daughters; (iii) WellPartner, LLC, operating from Woonsocket, Rhode Island, generated and transmitted to the University and UK King's Daughters each monthly remittance report stating the reduced figure as the gross insurance payment and stating patient cost-sharing as $0.00; and (iv) CVS Health Corporation, from Woonsocket, Rhode Island, owns and controls each of the foregoing entities, mandated the exclusive use of WellPartner as the University's and UK King's Daughters' 340B third-party administrator, and directed and ratified the rate-reduction and reporting practices with knowledge that the data transmitted to the University and UK King's Daughters was materially false.

185. Defendants knew these representations were false when made. The reduced 340B rate was generated by CaremarkPCS's own systems and accepted by CaremarkPCS's own affiliated pharmacy; the point-of-sale amount was known to CaremarkPCS because CaremarkPCS itself adjudicated and collected it; and the true patient cost-sharing amount was known to CVS Specialty because CVS Specialty itself collected it from the patient. No Defendant could have reported these figures without knowing they were false.

186. Defendants' concealment of the originally adjudicated point-of-sale payor reimbursement amount was material: had the University and UK King's Daughters known that CaremarkPCS was receiving materially more from payors than the amount reported to the University and UK King's Daughters, the University and UK King's Daughters would not have entered into or continued to perform under the Agreements, would not have paid dispensing fees and third-party administrator fees to Defendants.

187. Independent of any contractual obligation, Defendants owed the University and UK King's Daughters a duty to disclose the existence and operation of the secret 340B pricing arrangement. The existence of that arrangement was a fact basic to the transaction; and Defendants knew that the University and UK King's Daughters, as covered entities with statutory and HRSA compliance obligations that depend on accurate 340B claim and remittance data, would reasonably expect disclosure.

188. Defendants' duty to speak honestly about facts peculiarly and exclusively within their own knowledge arises from law, not from the Agreements, and would exist even in the absence of any contract between the parties.

189. The University and UK King's Daughters seek as fraud damages: (i) the dispensing fees and third-party administrator fees the University and UK King's Daughters paid to Caremark LLC d/b/a CVS Specialty and WellPartner in reliance on the false remittance reports, which the University and UK King's Daughters would not have paid had they known the truth; (ii) the 340B savings the University and UK

King's Daughters forwent by routing 340B-eligible prescriptions to CVS Specialty rather than to alternative contract pharmacies that would have remitted at market rates, as demonstrated by the substantially higher amounts the University and UK King's Daughters realized on identical prescriptions filled through its own specialty pharmacy; (iii) the internal investigative, accounting, and expert costs the University and UK King's Daughters incurred to detect and quantify the concealed scheme; and (iv) punitive damages, which are unavailable in contract, on account of Defendants' intentional and deliberate deceit.

190. Beyond the recurring remittance reports described above, Caremark LLC d/b/a CVS Specialty and WellPartner separately represented to the University and UK King's Daughters in the course of establishing and administering the contract pharmacy relationship that all reimbursement obtained by Defendants from all sources—including patients and third-party payors — less an agreed-upon dispensing fee, would pass to the University and UK King's Daughters and that WellPartner's reporting would accurately capture that reimbursement. Those representations were false when made, because Defendants had already established and were then operating the secret 340B pricing arrangement.

191. As a direct and proximate result of Defendants' fraud, the University and UK King's Daughters and their beneficiaries have suffered concrete and ascertainable pecuniary loss, including the categories of damages identified above, in an amount to be determined at trial.

192. Because Defendants' conduct was intentional and in deliberate

disregard of the University's and UK King's Daughters' rights, the University and UK King's Daughters further seek punitive damages.

**<u>COUNT THREE</u>**
**CIVIL RICO**
**18 U.S.C. 1962(c)**

193. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

194. Although the University of Kentucky is an independent body politic in the Executive Branch of the government of the Commonwealth of Kentucky, it is considered a "person" under 18 U.S.C. § 1961(3).[21]

195. The corporate and vertical relationships between CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner and their close association in relation to the administration of the University's and UK King's Daughters' 340B drug program, constitute a corporate enterprise as well as an association-in-fact enterprise among CVS Health's corporate entities, pursuant to 18 U.S.C. § 1961(4).

196. The above enterprise maintains an existence separate and apart from the pattern of racketeering activity alleged in this Complaint.

197. The conduct of this enterprise, in relation to the management of the University's and UK King's Daughters' 340B drug claims and remittances of 340B revenue to the University and UK King's Daughters, is carried out by Defendants

---

[21] *Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985)

CVS Health, CaremarkPCS, Caremark LLC, CVS Specialty, and WellPartner with a common purpose of depriving profits and revenue from the administration of the University's and UK King's Daughters' 340B drug program (the "CVS 340B Enterprise").

Predicate Act 1: 18 U.S.C. § 664

198. 18 U.S.C. § 664, embezzlement from employee benefit plan, makes it unlawful for "any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith."

199. As relevant here, much of the reimbursement for 340B drugs come from self-funded employee benefit plans that also provide medical and pharmacy benefits to their members.

200. By lawfully steering and diverting these 340B payments that should be flowing the ordinary course to the University and UK King's Daughters to themselves, Defendants violated 18 U.S.C. § 664 by unlawfully converted "to [their] own use" the "fund connected" with a welfare benefit plan, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 2: 18 U.S.C. § 1954

201. 18 U.S.C. § 1954 makes it unlawful to offer, acceptance or solicitation to influence operations of employee benefit plan, which makes it unlawful for any agent of an employee welfare benefit plan to, *inter alia*, receive any "kickback, commission,

gift, loan, money, or thing of value" in respect to "any of the actions, decisions, or other duties relating to any question nor matter concerning such plan," that exceeds the "bona fide salary, compensation, or other payments" that the agent is owed for its services.

202. Defendants violated 18 U.S.C. § 1954 by accepting "money, or thing of value" that exceeds the bona fide compensation and fair market value of the Contract Pharmacy Services rendered in relation to the administration of the University's and UK King's Daughters' 340B program, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 3: 18 U.S.C. § 1343

203. 18 U.S.C. § 1343, wire fraud, makes it unlawful for any person having devised, or intending to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

204. Defendants violated 18 U.S.C. § 1343 by devising and executing a coordinated scheme to defraud the University and UK King's Daughters through the use of interstate wire communications. Each use of the interstate wires in furtherance of the fraudulent scheme alleged herein constitutes a separate predicate act of racketeering activity. See 18 U.S.C. §§1961(1)(B), 1961(5).

205. Defendants devised and executed a coordinated scheme to defraud the

University and UK King's Daughters of more than $41 million in 340B Savings and reimbursement revenues to which the University and UK King's Daughters were contractually and legally entitled under the Pharmacy Services Agreements and HRSA/OPA regulations. The scheme was executed in material part through repeated uses of interstate wire communications, including but not limited to the following:

- *WellPartner Monthly Electronic Remittance Reports*. Since at least January 2020 and occurring monthly thereafter, WellPartner transmitted to the University and UK King's Daughters, via interstate electronic data transmission, monthly remittance reports for processed 340B drug claims. Those reports were transmitted by means of interstate wire communication from WellPartner's systems in Rhode Island to the University's and UK King's Daughters' systems in Kentucky. Each report falsely reflected a gross insurance payment to CVS Specialty that was materially less than the amount actually adjudicated and paid by the applicable payor at the point of sale, and falsely reflected a patient co-pay/co-insurance amount of $0.00 on the majority of claims. As a specific example, WellPartner transmitted a remittance report to the University and UK King's Daughters reflecting aa payor reimbursement of $19,378.62 for a Stelara prescription (NDC 57894006103) dispensed by CVS Specialty on October 15, 2024, when CaremarkPCS had in fact received $27,397.41 from the applicable payor for the identical drug on the same date—as confirmed by the $27,397.41 reimbursement the University and UK King's Daughters received when an

identical Stelara prescription was filled at a University of Kentucky Specialty Pharmacy on the same day under the same insurance plan.

- *CaremarkPCS Electronic Claims Rate Reduction Transmissions*. Since at least January 2020 and occurring on each occasion a 340B-eligible claim was processed through the CVS 340B scheme, CaremarkPCS transmitted via interstate electronic data interchange (EDI) and/or NCPDP claims processing networks a post-sale electronic adjustment or instruction to CVS Specialty/Caremark LLC directing that the originally adjudicated point-of-sale reimbursement rate be reduced to the artificially depressed 340B rate. These transmissions crossed state lines from CaremarkPCS's systems in Arizona to CVS Specialty/Caremark LLC's systems in Rhode Island (and/or other states). The Spread retained by CaremarkPCS as a result of these transmissions—the difference between the point-of-sale adjudicated amount and the lower 340B reimbursement—is money that belonged to the University and UK King's Daughters under the Agreements.
- *Internal Coordinating Electronic Communications*. Unidentified CVS Health and CaremarkPCS employees (John Does 1-15) transmitted by email and/or other electronic means via interstate wire communications to recipients including CaremarkPCS, CVS Specialty, and/or WellPartner personnel (John Does 1-15) electronic communications that: (i) established, ratified, and directed the internal policy to reduce reimbursement rates on 340B-identified claims after the point of sale; (ii) directed WellPartner to

report only the artificially reduced 340B rates (and not the higher point-of-sale adjudicated amounts) in the remittance data transmitted to the University and UK King's Daughters; and (iii) directed CVS personnel to refuse the University's and UK King's Daughters' October 31, 2025 audit demand in order to prevent the University and UK King's Daughters from discovering the full extent of the scheme.

206. Each of the wire transmissions described above was made by means of wire communication in interstate commerce. Each such crossing of state lines in furtherance of the fraudulent scheme constitutes a separate use of the interstate wires within the meaning of 18 U.S.C. § 1343 and a separate predicate act of racketeering activity.

207. Defendants acted with specific intent to defraud the University and UK King's Daughters of the 340B Savings. CVS Health publicly warned investors in its SEC filings that reductions in 340B Contract Pharmacy revenues could "materially and adversely affect" CVS Health's financial results, establishing that the retention of 340B Spread was a deliberate and financially significant business decision. CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits from 340B arrangements in 2022-2023. The sophistication and concealment built into the scheme—including using the mandatorily imposed and CVS-owned WellPartner as the exclusive vehicle to generate and transmit false remittance data to the University and UK King's Daughters, processing the post-sale rate reduction entirely within the CVS Health corporate family and invisible to the University and

UK King's Daughters, refusing the University's and UK King's Daughters' contractually and regulatorily required audit request, and then terminating the Pharmacy Services Agreements in retaliation for the University's and UK King's Daughters' efforts to expose the scheme—is strong circumstantial evidence of conscious misbehavior and deliberate intent to defraud.

208. The predicate acts of wire fraud described herein constitute a "pattern" of racketeering activity under 18 U.S.C. §§ 1961(1)(B) and 1961(5). These acts have been committed on a continuous and regular basis across thousands of individual 340B drug claims processed per month since at least 2020, establishing both open-ended continuity (the scheme is ongoing, as evidenced by continued processing of 340B claims after Defendants' retaliatory termination) and closed-ended continuity (the scheme has operated without interruption for more than six years). These predicate acts directly and proximately caused the University's and UK King's Daughters' injury. *See* 18 U.S.C. § 1964(c).

209. The University and UK King's Daughters relied on the materially false interstate wire communications described herein to their financial detriment. Specifically, the University and UK King's Daughters received each WellPartner electronic remittance report and, relying on its representation that the gross payment reflected therein was the full reimbursement from the applicable payor for 340B-eligible drug claims, accepted the remitted amounts (less the agreed dispensing and TPA fees) as full performance under the Agreements. In reliance on those false reports, the University and UK King's Daughters continued to perform under the

Pharmacy Services Agreements, continued to allow Caremark LLC d/b/a CVS Specialty to serve as Contract Pharmacies, and continued to pay substantial dispensing fees and TPA fees—none of which they would have done had they known the true amounts CaremarkPCS was receiving from payors at the point of sale. Each dispensing fee and TPA fee paid by the University and UK King's Daughters in reliance on WellPartner's false remittance data constitutes a concrete, out-of-pocket financial loss directly and proximately caused by Defendants' wire fraud.

210. The false reporting of patient co-pay/co-insurance as $0.00 further concealed the true point-of-sale transaction from the University and UK King's Daughters, depriving them of a critical indicator that would have revealed the discrepancy. As a direct result of relying on the false amounts stated in each wire transmission, the University and UK King's Daughters received less than the full 340B Savings to which they were entitled on each claim processed.

211. As a direct and proximate result of Defendants' racketeering activities described here, the University and UK King's Daughters have suffered significant damages in an amount to be determined at trial.

212. The University and UK King's Daughters further seek an injunction pursuant to 18 U.S.C. § 1964(a) to prevent future violations of 18 U.S.C. § 1962 by enjoining Defendants from their discriminatory pricing scheme.

## COUNT FOUR
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

213. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

214. Under Kentucky law, the duty of good faith and fair dealing is recognized in contracts such that "every contract contains an implied covenant of good faith and fair dealing which imposes upon the parties a duty to act in a bona fide manner." *Pearman v. W. Point Nat'l Bank*, 887 S.W. 2d 366, 368 (Ky. App. 1994). Good faith and fair dealing is violated when "the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457-58 (6th Cir. 2005).

215. Here, Defendants breached the implied covenant of good faith and fair dealing when Defendants created a secret 340B arrangement under which CaremarkPCS artificially reduced the reimbursement rate for the University's and UK King's Daughters' 340B drugs dispensed by Caremark LLC d/b/a CVS Specialty to 340B-eligible patients of the University and UK King's Daughters/Covered Entities. Defendants did so intentionally to lower the 340B savings that they would need to pass on to the University and UK King's Daughters so that they can divert the 340B savings as pure profit to themselves.

216. Additionally, CaremarkPCS, Caremark LLC, CVS Specialty, and

WellPartner breached the covenant of good faith and fair dealing by actively concealing their discriminatory 340B pricing scheme, thereby also depriving the University and UK King's Daughters of the benefit of their bargain.

217. Defendants further breached the covenant of good faith and fair dealing by terminating the Agreements in response to the Covered Entities' exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations. Accordingly, the University and UK King's Daughters seek an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

218. The unlawful and retaliatory terminations further harmed the University and UK King's Daughters by depriving them of the 340B savings that would have been generated through the contract pharmacy relationship had the Agreements not been terminated.

219. As a direct and proximate result of Defendants' improper conduct, the University and UK King's Daughters have suffered significant damages in an amount to be determined at trial.

**COUNT FIVE**
**UNJUST ENRICHMENT**

220. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

221. In the alternative, to the extent it is somehow found that the Agreements do not expressly prohibit Defendants from retaining Spread and failing

to remit to the University and UK King's Daughters all payments from patients and third-party payors less the agreed-upon dispensing fee, then Defendants improperly obtained for themselves benefits to which they were not entitled and which it would be unconscionable and otherwise inequitable for them to retain, because the 340B savings were intended by Congress to accrue to the Covered Entities and their patients. *See, e.g., Satterfield v. Satterfield*, 608 S.W.3d 171, 174 (Ky. App. 2020) (defining unjust enrichment as "a basis of restitution to prevent one person from keeping money or benefits belonging to another").

222. As a result of Defendants' having unfairly obtained a benefit to which the University and UK King's Daughters were in fact entitled, the University and UK King's Daughters have suffered a concrete and irreparable harm as well as significant damages to be determined at trial.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH CONTRACT

223. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

224. Defendants tortiously interfered with the Agreements between the University and UK King's Daughters and Caremark LLC by executing the secret 340B arrangement under which CaremarkPCS artificially reduced the reimbursement rate for the University's and UK King's Daughters' 340B drugs dispensed by Caremark LLC/CVS Specialty to 340B-eligible patients of the Covered Entities. As part of that scheme, Defendants caused Caremark LLC/CVS Specialty to

accept artificially reduced reimbursement rates after claims were identified as 340B. Defendants did so intentionally to lower the 340B savings that they would need to pass on to the University and UK King's Daughters under the Agreements, so that they can divert the 340B savings as pure profit to themselves.

225. Defendants further intentionally and improperly interfered with the Agreements by directing WellPartner to falsify the remittance reports provided to the University and UK King's Daughters that concealed the higher point-of-sale reimbursement and obfuscated the patient out-of-pocket costs—critical datapoints that would have revealed the discriminatory pricing scheme.

226. Defendants further intentionally and improperly interfered with the Agreements by terminating the Agreements in response to the Covered Entities' exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations.

227. Defendants terminated the Agreements as punishment for the University's and UK King's Daughters' exercise of their legal rights under 340B Program rules and HRSA regulations, rather than for legitimate performance or business reasons.

228. The unlawful and retaliatory terminations further harmed the University and UK King's Daughters by depriving them of the 340B savings that would have been generated through the contract pharmacy relationship had the Agreements not been terminated.

229. As a direct and proximate result of Defendants' tortious interference,

the University and UK King's Daughters have suffered significant damages in an amount to be determined at trial.

**COUNT SEVEN**
**BREACH OF CONTRACT RELATING TO THE DENIAL OF AN AUDIT**

230. The University and UK King's Daughters repeat and reiterate each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

231. At all relevant times, Caremark LLC d/b/a CVS Specialty had a contractual duty to cooperate with the University's and UK King's Daughters' requests to audit the pharmacies' books and records.

232. On November 3, 2025, the University and UK King's Daughters served on Caremark LLC an audit demand letter dated October 31, 2025 setting forth the University's and UK King's Daughters requests to conduct an audit.

233. Caremark LLC/CVS Specialty has refused the University's and UK King's Daughters' request for access to such books and records.

234. The University and UK King's Daughters seek an order enjoining Caremark LLC/CVS Specialty from restricting the University and UK King's Daughters' access to the pharmacy's books and records and requiring Caremark LLC and CVS Specialty to comply with the audit provisions of the Agreement.

235. Defendants further breached the contractual audit provisions by terminating the Agreements in response to the Covered Entities' exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations. Accordingly, the University and UK King's

Daughters seek an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

236. Further, an accounting of Defendants' records is necessary to determine the full extent and amount of the University's and UK King's Daughters' damages and losses resulting from the violations and breaches alleged herein.

**WHEREFORE,** the University and UK King's Daughters respectfully pray for judgment in their favor and against Defendants as follows:

(a) Declaring that Defendants breached the Pharmacy Services Agreements, committed fraud, and violated 18 U.S.C. § 1962 by, among other things, (1) failing to remit to the University and UK King's Daughters the full amount of reimbursements the Defendants received from third-party payors less the agreed-upon dispensing fee, (2) failing to comply with HRSA and OPA regulations and guidelines regarding contract pharmacy services; (3) depriving the University and UK King's Daughters of the 340B savings they were entitled to receive due to Defendants' fraudulent pricing scheme; and (4) refusing to cooperate with the University's and UK King's Daughters' reasonable request to audit Defendants' records pursuant to the audit provisions of the Agreements;

(b) Further declaring that Defendants breached their duty of good faith and fair dealing, and/or was unjustly enriched due to the conduct alleged above;

(c) Entering an injunction to prevent future violations of the above;

(d) Entering an injunction to enjoin the unlawful and retaliatory termination of the Agreements;

(e) Awarding the University and UK King's Daughters all damages adequate to compensate them, such damages to be determined by a jury, including treble damages and attorneys' fees pursuant to the RICO statute;

(f) Ordering Defendants to disgorge any profits or "Spread" unjustly retained by Defendants from the University's and UK King's Daughters' 340B savings;

(g) Ordering Defendants to provide all accountings necessary to determine the amounts it must remit to the University and UK King's Daughters to restore losses and to disgorge any profits Defendants unlawfully and unjustly retained;

(h) Awarding the University and UK King's Daughters prejudgment and post judgment interest as allowed by law;

(i) Awarding the University and UK King's Daughters attorneys' fees and all costs of court; and

(j) Awarding the University and UK King's Daughters any other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, the University and UK King's Daughters demand a trial by jury as to all claims and all issues properly so triable.

**Sturgill, Turner, Barker & Moloney, PLLC**

*/s/ Bryan H. Beauman*
Bryan H. Beauman
Derrick T. Wright

333 W. Vine Street, Suite 1500
Lexington, KY 40507
Telephone: (859) 255-8581
bbeauman@sturgillturner.com
dwright@sturgillturner.com

&

William E. Thro,
*General Counsel*
Steve Clifton,
*Deputy General Counsel*
University of Kentucky
301 Main Building
Lexington, KY 40506
William.Thro@uky.edu
Steve.Clifton@uky.edu

&

**FRIER LEVITT, LLC**
Jonathan E. Levitt, Esq.
(pro hac vice admission pending)
Matthew J. Modafferi, Esq.
(pro hac vice admission pending)
One World Trade Center, Suite 45E
285 Fulton Street
New York, NY 10007
Telephone: (646) 970-2711
jlevitt@frierlevitt.com
mmodafferi@frierlevitt.com

*Attorneys for the University and UK King's Daughters*